UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAKINI JACKSON,

       Plaintiff,                                Civil Action No. 18-CV-11199

vs.                                        HON. BERNARD A. FRIEDMAN

GENESEE COUNTY
ROAD COMMISSION,

       Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

       This matter is presently before the Court on defendant's motion for summary judgment [docket entry 14]. Plaintiff has responded, and defendant has replied. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing.

***Background***

       This is an employment discrimination case in which plaintiff Makini Jackson, an African-American woman, alleges that her former employer, defendant Genesee County Road Commission, retaliated against her by terminating her employment as human resources director and EEO officer. Plaintiff claims she was terminated for investigating employees' complaints of race discrimination and for her handling of EEO plan submissions. Plaintiff asserts a retaliation claim under Title VII and the Elliott-Larsen Civil Rights Act ("ELCRA") (Count I) and a "wrongful termination/retaliation" claim in violation of Michigan's public policy (Count II). Defendant now seeks summary judgment. For the reasons explained below, the Court shall grant defendant's motion.

Plaintiff's Investigation of Employees' Complaints of Race Discrimination

On March 31, 2016, plaintiff was hired as defendant's director of human resources and EEO officer by John Daly, defendant's manager/director. Pl.'s Dep. at 14-15, 172; Daly's Dep. at 38. Plaintiff reported directly to Daly. Pl.'s Dep. at 64. Prior to hiring plaintiff, Daly had acted as the interim human resources director (in addition to manager/director) for four years. *Id.* at 50-52; Daly's Dep. at 36.

Plaintiff alleges that when she started her job, she received "numerous discrimination complaints from African American and female employees, largely directed at Defendant's Equipment & Facilities Director," John Bennett, a Caucasian male who had worked for defendant for almost thirty years. Compl. ¶ 18. Plaintiff alleges that she investigated the complaints and that:

> 20. During the course of this investigation, Plaintiff discovered that these employees' prior reports of discrimination had been improperly ignored.
>
> 21. Plaintiff's actions brought current and past discriminatory behaviors to Defendant's attention giving it no option other than to discipline these individuals. However, angered at Plaintiff's actions it retaliated against her by terminating her employment a short time later.
>
> 22. Plaintiff also informed the Defendant's Board of Road Commissioners that staff members had improperly approved contractors whose EEO Plans were non-compliant with Defendant's own EEO [sic] as well as state and federal law.
>
> 23. Plaintiff was to be the sole contact with potential contractors concerning EEO Plan compliance yet other Defendant employees ignored this directive. When Plaintiff challenged violators she was reprimanded to use a softer tone when communicating with the men in the office. Shortly thereafter, she was terminated.
>
> 24. After Plaintiff made such complaints of failure to follow local, state and federal laws and procedures, she was retaliated against by Defendant, including being terminated on October 17, 2016 without any reason being given.

*Id.* ¶¶ 20-24.

The preexisting "discrimination complaints" plaintiff refers to above were made by three of defendant's employees: Anthony Branch (maintenance director), Joyce McClane (purchasing manager), and Felicia Ivey (safety coordinator). Pl.'s Dep. at 68-78, 84, 105-06. Plaintiff discussed these complaints, which included complaints against Bennett, with Daly, who was Bennett's direct supervisor.[1] *Id.* at 64, 70, 78, 80-81; Daly's Dep. at 65-66. Based on her investigation, plaintiff recommended to Daly that Bennett be placed on administrative leave and be required to undergo a psychological evaluation. Pl.'s Dep. at 81, 112. Daly followed this recommendation and placed Bennett on a paid leave of absence. The psychological evaluation was scheduled for May 16, 2016, and determined that Bennett was fit for duty. Pl.'s Ex. 3; Pl.'s Dep. at 114.

In July 2016, Daly provided Bennett with a "final warning" letter and a "return to work" letter indicating that his return to work was conditioned on him modifying his behavior and improving his work performance. Pl.'s Exs. 4, 5; Pl.'s Dep. at 123-26, 129, 133. Plaintiff states that she did not want Bennett to return to work, whereas Daly and defendant's attorney Thomas Derderian initially wanted Bennett to return but changed their minds after talking to him. Pl.'s Dep. at 127. Bennett was not agreeable to complying with the conditions in Daly's letters. Pl.'s Ex. 4; Pl.'s Dep. at 122, 130-31. The conversation between plaintiff, Daly, Derderian, and Bennett then shifted to negotiating a severance package for Bennett. Pl.'s Dep. at 130-33. Bennett made an initial demand that Daly and plaintiff thought was outrageous, *id.* at 131-34, but Daly authorized plaintiff to continue discussions with Bennett. *Id.* at 134-36; Daly's Dep. at 68. Plaintiff and

---

[1] Branch was Bennett's supervisor before Bennett was promoted to his position as equipment and facilities director. Branch Dep. at 6.

Bennett eventually reached an agreement, Pl.'s Dep. at 136, and a severance agreement was signed by Bennett and Daly in August 2016 with the board's approval. Pl.'s Ex. 8; Pl.'s Dep. at 145, 149; Daly's Dep. at 9. Daly states that he "had seriously considered" firing Bennett and might have done so had Bennett not "retired." Daly's Dep. at 9.

When Daly provided Bennett with the "return to work" letter, plaintiff notified Branch, McClane, and Ivey of the possibility that Bennett would be coming back to work. Pl.'s Dep. at 128-29, 138, 140. Ivey then emailed plaintiff and Daly an official complaint against Bennett. *Id.* at 137; Ivey's Dep. at 27-28, 35. Plaintiff does not recall if Branch and McClane did the same, Pl.'s Dep. at 142, but Ivey believes Branch did so around the same time. Ivey's Dep. at 28. Plaintiff states that "all three of them [i.e., Branch, McClane, and Ivey] asked for [an Equal Employment Opportunity Commission ('EEOC') complaint form]." Pl.'s Dep. at 78-80, 83, 86-88; Ivey's Dep. at 31; Branch's Dep. at 25. Plaintiff is not aware of anyone filing an EEOC complaint during, or prior to, her employment with defendant, Pl.'s Dep. at 152, but Branch filed an EEOC charge that remains pending. Branch's Dep. at 32; Ivey's Dep. at 32; Mullin's Dep. at 22-23.

Plaintiff "never reached a conclusion as it related to John Bennett [discriminating against McClane] because he eventually left the road commission,"[2] Pl.'s Dep. at 108, and plaintiff "did not provide a conclusion" as to whether Bennett discriminated against Ivey based on race or gender.[3] *Id.* at 111. Plaintiff was asked at her deposition whether she "ever reached a conclusion

---

[2] Regarding the investigation of McClane's complaint, Rachel Mullin (personnel manager) testified that her recollection was that in the end "it was not found to be true." Mullin's Dep. at 26. Mullin is unsure whether McClane's complaint was for harassment or retaliation. *Id.*

[3] Ivey testified that "I don't know what John [Bennett]'s issue was with me. I can't say that it wasn't [race discrimination], but I can't say for a fact that it was." Ivey's Dep. at 26, 33. She does not remember if her complaint included race and/or gender discrimination. *Id.* at 29.

about whether or not John Bennett was discriminating against Anthony Branch based on his race," and she responded: "The conclusion as far as to an investigation, nothing written down, but I concluded that he absolutely was." *Id.* at 108. Defendant interprets plaintiff's deposition testimony as indicating that she "never reached a conclusion in her investigation on whether Bennett was actually discriminating against anyone." Def.'s Br. at 2. But plaintiff's affidavit, which is attached to her response as Exhibit I, supports her assertion that she did reach a conclusion as to this issue:

> 2. After my investigation of Maintenance Director Anthony Branch's complaints of race discrimination against the Genesee County Road Commission's Director of Facilities and Equipment John Bennett, I concluded that Bennett had discriminated against Branch on the basis of his race – African American.
>
> 3. I advised the GCRC's then Managing Director John Daly that I had reached this conclusion and that it needed to be affirmatively addressed with Bennett.

Pl.'s Aff. ¶¶ 2-3.

<u>Plaintiff's Handling of EEO Plan Submissions</u>

In July 2016, plaintiff added language to defendant's EEO plan policy. She specified that submissions had to be typed and emailed directly to her; that all questions regarding defendant's EEO plan, process, and requirements had to be directed solely to her via email; and that policy non-compliance may result in plaintiff asking the board to cancel the contract and/or declare the vendor, bidder, supplier, or contractor ineligible for future contracts. Pl.'s Dep. at 58-60, 181-82, 193-98; Def.'s Ex. 7. Non-compliance was determined by plaintiff on a "case-by-case

---

She testified that she does not know if she was ever treated differently by anyone at the road commission because of her gender. *Id.* at 32.

basis." Pl.'s Dep. at 62, 191. Plaintiff recalls at least one contractor that was "not pleased with having to resubmit their application in order for it to be approved." *Id.* at 188.

Plaintiff had concerns with employees violating the revised policy. *Id.* at 200. Plaintiff informed the board at a meeting in August 2016 that Fred Peivandi (engineering director) and John Plamondon (engineering employee/construction director)[4] were violating EEO policy when hiring contractors because they "were colluding and communicating with potential bidders, contractors and suppliers [via e-mail about EEO requirements] before they had submitted all the required documentation to even be considered for a contract with the road commission, and they should not have had any communication with them before that was done." *Id.* at 175-81, 199-200. Plaintiff also complained to Daly that Peivandi was presenting bids for consideration by the board before the EEO submission had been approved, which was against the policy. Daly's Dep. at 43.

Daly supported plaintiff in her work as EEO officer, including when she enforced the policy. At her deposition, plaintiff described a meeting between her, Daly, and Peivandi as follows:

> A: The meeting was held, as I had indicated to John Daly, that this communication in the engineering department with these vendors is in violation of policy. During that conversation, Fred [Peivandi] went on and on about a host of things and commented this is not the way we used to do things, and John Daly responded by saying the way we were doing them was wrong, and you are no longer to have any communications with any vendor, supplier, contractor regarding EEOC [sic], and that's what occurred at the meeting.
>
> Q: John Daly agreed with you?
>
> A: Yes.

---

[4] Plaintiff states that Plamondon worked under Peivandi in the engineering department. Pl.'s Dep. at 217. Daly identifies Plamondon as "the director of construction." Daly's Dep. at 47.

Pl.'s Dep. at 215-16. Daly testified that he supported plaintiff when Peivandi complained to him about plaintiff's handling of EEO plan submissions due to issues with timeliness and difficulties getting approval:

> Q: Did you talk to [plaintiff] about [Fred Peivandi's complaint]?
>
> A: I did.
>
> Q: What was her response?
>
> A: Her response was that she was doing what was necessary in the EEOC [sic] compliance. . . . I had a meeting with both her and Fred. . . . in that meeting I supported [plaintiff], and I supported her in the EEOC [sic]. . . .
>
> Q: Fred, however, did complain about the EEO submission process?
>
> A: That's correct.
>
> Q: And when you supported [plaintiff] on that, that was a meeting Fred walked out on, correct?
>
> A: That's correct.
>
> Q: Did you ever not support [plaintiff] on the EEO submission process?
>
> A: I don't believe so. Not that I recall. I always supported her because she was – the EEOC [sic] plans were one of the things we were required to do [under federal law].

Daly's Dep. at 42-45. Daly "thought the EEOC [sic] processing . . . was certainly an improvement [when it was handled by plaintiff] over what it had been on my watch. She was much better prepared for that than I was." *Id.* at 48.

With respect to Plamondon, there was "no objection" from Daly when plaintiff communicated with Plamondon in writing about the perceived policy violation. Pl.'s Dep. at 216. However, plaintiff states that "when I spoke with John Daly, he said that he had spoken with Plamondon, and Plamondon told him he was scared of me, and John Daly suggested that I speak more softly to John Plamondon." *Id.* at 216-17. Plaintiff "was offended by [Daly's comment]

because that was not something he would have asked a man to do." *Id.* at 218. It appears this is the incident plaintiff refers to in the complaint where she alleges that "[w]hen she challenged [EEO policy] violators she was reprimanded to use a softer tone when communicating with the men in the office. Shortly thereafter, she was terminated." Compl. ¶ 23.

<u>Plaintiff's Job Performance and Termination</u>

Plaintiff states that she and Daly, who was her direct supervisor, had "a very positive relationship." Pl.'s Dep. at 64, 67. Daly never "officially disciplined [plaintiff] in any way," but he states that he "counseled" her twice (orally, not in writing). Daly's Dep. at 16-17, 66; Mullin's Dep. at 43. The first time Daly counseled plaintiff was due to Derderian's complaint[5] that plaintiff was limiting his ability to directly contact employees he needed to interview for defendant's legal matters. Daly's Dep. at 17-20. Plaintiff disputes that she was "verbally counseled by Daly regarding my interactions and/or conduct toward [defendant's] outside legal counsel Thomas Derderian." Pl.'s Aff. ¶ 4. She explains that she limited Derderian's contact with employees in an effort to reduce his billings, which she believed were excessive, because he charged for each communication he had with every individual even if it was for the same information. Pl.'s Dep. at 158-60; Daly's Dep. at 61; Mullin's Dep. at 35-36.

The second time Daly counseled plaintiff was because "she exceeded her authority" in negotiating a severance package with Bennett; Daly had told plaintiff the package was capped at a certain dollar amount, and plaintiff exceeded it. Daly's Dep. at 20, 68. But Daly also praised plaintiff for her negotiations with Bennett because prior to this she appeared to have "one style of management . . . that was basically a very direct confrontational form of management that wasn't

---

[5] Daly recalls that Derderian complained to him about plaintiff three or four months after she was hired, and again one month before she was fired. Daly's Dep. at 18.

working," and he saw this as "a step in a good direction" and "a positive sign, that she did have alternative [management] styles." *Id.* at 21, 68.

On October 17, 2016, Daly terminated plaintiff's employment. He told plaintiff that it was "because I was at will." Pl.'s Dep. at 172, 219-20; Daly's Dep. at 54-55. Plaintiff accepted a severance payment that Daly calculated "us[ing] essentially the same formula that she had used for Bennett's severance package." Daly's Dep. at 55. Daly explained that "there was a difference because of the fact that John Bennett was like a 26-year employee with [defendant] and [plaintiff] had been there a very short period of time." *Id.* at 55-56.

Not needing the board's approval to hire or fire employees, Daly's decision to hire and fire plaintiff was entirely his own. Pl.'s Dep. at 67-68; Daly's Dep. at 16, 28; Derderian's Dep. at 44-46; Dickerson's Dep. at 8. Daly states that he terminated plaintiff because she "had a communication style that was abrasive and offensive to people. It was – the impact of that communication style was dissatisfaction and acrimony. Her management style was monolithic. . . . And . . . the situation was not improving, it was getting worse."[6] Daly's Dep. at 16. Daly defines "monolithic style" as "[v]ery forceful, confrontational, rigid." *Id.* at 21. What contributed to his decision to terminate plaintiff after the second time he counseled her (regarding her negotiations with Bennett) was that Derderian complained to Daly "[t]hat he was having increasing difficulties dealing with [plaintiff]," *id.* at 18, and Daly

---

[6] Consistent with Daly's testimony, Derderian testified that Daly terminated plaintiff because

> [b]asically . . . nobody could stand her, she couldn't work with anybody, she had a riot on his hands with a lot of the suppliers that he was unhappy about. He had hoped she would settle down after she had been there a while. But no, he was fed up with her and he was letting her go.

Derderian's Dep. at 43.

> was receiving numerous complaints. . . . I received complaints from three of the board members, I received complaints from the union representatives of the two major labor unions at the road commission, I received complaints from all of the department heads except for one, Mr. Branch, and I received complaints from several outside contractors. I received complaints from employees as well.

*Id.* at 23. All of these complaints involved plaintiff's "communication style."

Daly testified that board members Dave Miller and Bob Johnson complained "that they had received complaints from outside parties and from employees related to [plaintiff's] communication style." *Id.* Board member John Mandelaris "expressed his concern to [Daly] about [plaintiff's] communication style and abrasiveness and the manner in which she treated Tom Derderian as [defendant's] legal counsel." *Id.* at 24. Union representative Howard Gordon said "that communications were extremely difficult with [plaintiff]" and "that she was abrasive, offensive, that she had no respect for anyone in the room, that it was difficult to deal with her through a curtain of hate." *Id.* at 24-25. Another union representative whose name Daly could not remember said "there were communication problems, that [plaintiff] was inflexible, and that – very rigid." *Id.* at 25. Derderian, who had his own difficulties working with plaintiff, Derderian's Dep. at 11-15, 19, received complaints from union representatives Howard Gordon and Terry Campbell that dealing with plaintiff "was extremely difficult." *Id.* at 34-36. Derderian told Daly about Gordon's frustrations but learned about Campbell's after plaintiff left. *Id.* at 36.

All of defendant's department heads, except Branch, complained to Daly that plaintiff's "communication style was abrasive, that she was offensive, that she was inflexible." Daly's Dep. at 26-28, 31, 45, 47-48. Department head Melissa Williams added "that [plaintiff's] approach was it's going to be my way or nothing, and that she simply couldn't work with her." *Id.* at 45. Department head Coetta Adams similarly reported to Daly that plaintiff "was difficult to work with, . . . that there was no compromise with her, that everything had to be her way." *Id.* at

47.  Department head Herb Herrick told Daly that plaintiff "was tough, she was hard, she was brutal."  *Id.* at 48.  Department head Randy Dellaposta complained to Daly that plaintiff was "[e]xtremely difficult to work with, abrasive communication style, that she was impossible, and had adverse effects on employees."  *Id.* at 52-53.

Moreover, when Daly testified about the meeting he had with plaintiff and Peivandi regarding EEO plan submissions, Daly indicated that Peivandi's complaint also involved plaintiff's problematic communication and management style:

> Q:  Did you talk to [plaintiff] about [Peivandi's complaint regarding EEO submissions]?
>
> A:  I did.
>
> Q:  What was her response?
>
> A:  Her response was that she was doing what was necessary in the EEOC [sic] compliance.  If I could, this wasn't about the EEOC [sic] complaints.  I had a meeting with both her and Fred [Peivandi]. . . . in that meeting I supported [plaintiff], and I supported her in the EEOC [sic].  The problem with this was if you look at the list, that's a fairly comprehensive list.  The complaint is pretty much the same, abrasive communications, offensive language, and a very forceful and monolithic management style, one that was not in line with what [defendant] needed to have good relations with its employees, its unions, and the people we worked with.

*Id.* at 44.

Daly testified that Ron Latimer (maintenance department lead supervisor) told him that plaintiff "had a very corrosive and abrasive communication style, she had only one approach that she would use, and that the times she was asking things of the supervisors to do, that they were unreasonable."  *Id.* at 49.  However, Latimer testified that he never said, or heard anyone say, that plaintiff "was very corrosive and had an abrasive communication style."  Latimer's Dep. at 11-12.  Latimer testified that he never had a discussion with Daly about plaintiff and that he never expressed any concerns or complaints about her to anybody.  *Id.* at 8.

Additionally, Daly received complaints about plaintiff from two contractors: Wolverine Culverts ("Wolverine") and Precision Computer Solutions, PCS ("Precision"). Daly's Dep. at 39. Wolverine complained to Daly about having to make multiple EEO form submissions, but Daly stated that

> again, more than anything else, they were talking about the communication style, the fact that [plaintiff] was difficult to work with, that she did not return calls in a timely manner, that the direction they got was not consistent. And this to me had more to do with communication style that was being used across the board rather than just dealing with the EEOC [sic].

*Id.* at 39-40. The human resources director at Wolverine, "a long time contract person with [defendant]," told Daly that "if [plaintiff] continued as the HR director, . . . they were not going to do business with [defendant]." *Id.* at 40. Plaintiff does not recall any issues with Wolverine and their EEO plan. Pl.'s Dep. at 219. As for Precision, its president told Daly that "[t]he communication style was extremely abrasive, that she was having a very difficult time dealing with [plaintiff], that the changes that they were being asked to make were not consistent." Daly's Dep. at 41. Based on his review of certain documents, Daly found plaintiff's communication style with Precision "abrasive and . . . not conducive to continued good relations between Precision and [defendant]."[7] *Id.*

Plaintiff is unaware of any problems regarding how she dealt with employee complaints and "how I was handling my job." Pl.'s Dep. at 153, 156. She also has no knowledge of complaints from lawyers or unions about her job performance. *Id.* at 157. Plaintiff characterizes

---

[7] Precision's president also complained to Daly that plaintiff "had withheld payment of a bill until certain matters were resolved between [plaintiff's] office and Precision." Daly's Dep. at 50. Daly stated that "HR doesn't have the authority to withhold that," but he did not speak to plaintiff about the withheld payment because "[t]his was the day before I terminated her." *Id.* at 51.

her relationship with Derderian as "professional" despite having to tell him she believed he "was stepping outside of his lane . . . as it related to human resources and labor relations." *Id.* at 168-69. Some of defendant's employees and one road commissioner were satisfied with plaintiff's work and had no problems with her.[8]

As noted, Daly discharged plaintiff on October 17, 2016. On May 17, 2017, plaintiff filed an EEOC charge against defendant in which she alleged retaliation:

> I began working for the above-named employer on March 31, 2016 and was last employed as the Director of Human Resources and Administrative Services.
>
> From the beginning of my employment, I began addressing charges of discrimination by African American employees that had been previously ignored. I also informed the Board that staff members were violating EEO policies when hiring contractors. On October 27, 2016, I was discharged with no reason given.
>
> I believe I was discharged in retaliation for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

---

[8] Branch had an "[e]xcellent" working relationship with plaintiff and although he overheard comments from other departments about her, he "never had any problems." Branch's Dep. at 9. Branch never heard plaintiff speak disrespectfully to anybody, *id.* at 11, and Daly never told Branch anything about plaintiff "outside of she was doing a good job." *Id.* at 9. Ivey had "a good working relationship" with plaintiff; she thought plaintiff "was a good supervisor. I didn't have any problems with her. [S]he was always helpful to me" and "always professional from what I saw." Ivey's Dep. at 10, 30. Ivey never made or received complaints about plaintiff. *Id.* at 10-11. Mullin stated that she "got along with [plaintiff, who was her boss,] good," Mullin's Dep. at 10, and that plaintiff "did a good job" as the human resources director. *Id.* at 19. She testified that "[n]o one ever made any complaints to [her]" about plaintiff. *Id.* Latimer had a "[g]reat" working relationship with plaintiff and appreciated her "transparen[cy]." Latimer's Dep. at 8. He never complained or heard anyone else complain about her. *Id.* Road commissioner Cloyce Dickerson had a "[g]ood" relationship with plaintiff and never heard anyone say anything negative about her during her employment or after she left. Dickerson's Dep. at 11, 20. He was shocked and upset by her termination, which he thought was "very unfair." *Id.* at 10, 20-21.

Pl.'s Additional Ex. [docket entry 18]; Pl.'s Dep. at 225-27; Def.'s Ex. 10. The EEOC issued a right to sue letter on January 17, 2018. Def.'s Ex. 10. Plaintiff then filed the complaint in the instant matter on April 16, 2018.

***Discussion***

Limitations Period

Because plaintiff asserts claims under Title VII, it is important to keep the applicable statute of limitations in mind. Title VII requires a plaintiff to file an EEOC charge within 300 days of the alleged discriminatory act. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001). In the present case, plaintiff's EEOC charge was filed on May 17, 2017. Therefore, nothing that happened to her before July 21, 2016, is actionable under Title VII. Plaintiff asserts that she began addressing "previously ignored" complaints of discrimination "[f]rom the beginning of my employment," and plaintiff was hired on March 31, 2016.

Retaliation Claim Under Title VII and ELCRA (Count I)

Plaintiff makes the following allegations as to her retaliation claim in Count I:

27. Plaintiff repeatedly engaged in conduct protected under both Title VII and the ELCRA, *i.e.*, opposing and complaining of the racially discriminatory and harassing conduct by Defendant's agents, servants, and/or employees.

28. Defendant had knowledge of Plaintiff's protected activity, to-wit: Plaintiff repeatedly complained to her supervisors and Defendant's Board about a pattern and practice of ignoring and not remediating unlawful employment practices.

29. Defendant subsequently took an adverse, retaliatory action against Plaintiff by terminating her from her employment.

30. Plaintiff's protected conduct was a significant factor in Defendant's adverse employment action taken against her.

31. The retaliation would not have occurred had Plaintiff not engaged in activity protected by both Title VII and the ELCRA.

32. Defendant's actions were retaliatory and in violation of both Title VII and the ELCRA.

Compl. ¶¶ 27-32.

Retaliation claims under Title VII and state law are both analyzed under the same legal standards. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 n.2 (6th Cir. 2019). Where there is no "direct evidence" of retaliation, as is the case here, the *McDonnell-Douglas* burden-shifting framework applies, and the plaintiff has the burden of establishing a prima facie case of retaliation. The Sixth Circuit has stated that

> [t]o establish a prima facie case of retaliation a plaintiff must establish that: (1) she engaged in a protected activity; (2) her "exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action."

*Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)). "'Protected activity' includes 'opposition' to unlawful employment discrimination and 'participation' in investigations or proceedings involving unlawful discrimination." *Ellis v. Prospect Airport Servs.*, No. 17-13852, 2019 WL 2218819, at *5 (E.D. Mich. Jan. 25, 2019) (citing *Skrine v. Barrett Paving Materials, Inc.*, No. 13-CV-14900, 2015 WL 5214636, at *13 (E.D. Mich. Sept. 4, 2015)), *R&R adopted*, No. 17-13852, 2019 WL 1417163 (E.D. Mich. Mar. 29, 2019).

Defendant seeks summary judgment on the retaliation claim in Count I on the grounds that plaintiff did not engage in protected activity, defendant did not oppose her handling of "purported 'unlawful employment' issues," and no causal connection exists between how plaintiff handled "employment issues" and her termination. Defendant's challenge is therefore

directed at the first element (protected activity) and fourth element (causal connection) of plaintiff's prima facie retaliation claim.

### 1. Protected Activity

Defendant argues that plaintiff did not engage in protected activity because she "was not involved in any Title VII proceedings." Def.'s Br. at 11. Defendant argues that plaintiff was unaware of any EEOC complaints having been filed and never reached a conclusion as to discriminatory conduct by employees. It also argues that internal personnel investigations are not protected by Title VII. Plaintiff characterizes defendant's arguments as falling under Title VII's participation clause. She indicates that her claim is based on Title VII's participation clause *and* its opposition clause,[9] and her argument for both is essentially the same: she "clearly" engaged in protected activity because she investigated employee complaints of unlawful discrimination, concluded that Bennett racially discriminated against Branch, told Daly her conclusion about Bennett's conduct towards Branch, and supported Branch, McClane, and Ivey in their requests for EEOC complaint forms and when Branch and McClane "each threatened further action." Pl.'s Resp. at 22-24.

Plaintiff has not established that she engaged in protected activity under Title VII's participation clause. This Court has stated that

> Title VII's participation clause "protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003) (citing *EEOC v. Total Sys. Serv., Inc.*, 221 F.3d 1171, 1174 n.2 (11th Cir. 2000); *Total Sys. Serv., Inc.*, 221 F.3d at 1174 n.2 (holding that the

---

[9] In paragraphs 27 and 28 of the complaint, *see supra* at 14, plaintiff uses the words "opposing" and "complaining" – and not "participating" – which makes it seem that her claim was initially based on Title VII's opposition clause. But because she indicates that her claim is under the participation clause and the opposition clause, the Court analyzes plaintiff's claim under both clauses.

> participation clause protects participation in activities that "occur in conjunction with or after the filing of a formal charge with the EEOC," not participation "in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC").

*Skrine*, 2015 WL 5214636, at *13. In the present case, there is no indication that plaintiff's investigation "occur[ed] pursuant to a pending EEOC charge." Branch filed an EEOC charge that remains pending, but plaintiff has made no showing that the charge was filed prior to her termination or that her investigation was connected to it in any way. And plaintiff's own EEOC charge was not pending during her investigation because she filed it on May 17, 2017, seven months after her termination. Pl.'s Dep. at 225-27; Def.'s Ex. 10; Pl.'s Additional Ex. [docket entry 18].

Plaintiff has likewise not established that she engaged in protected activity under Title VII's opposition clause. "'[O]pposition' to an [unlawful] employment practice . . . may include 'not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices.'" *Ivezaj v. Detroit Pub. Sch.*, 99 F. Supp. 3d 735, 752 (E.D. Mich. 2015) (quoting *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015)). According to the Sixth Circuit,

> [t]he opposition clause . . . covers conduct such as "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer – e.g., former employers, union, and co-workers." *Johnson*, 215 F.3d at 579. We have explained that "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of [the employee's] opposition must be reasonable." *Id.* at 580.

*Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (alteration in original). "Although vague complaints do not constitute opposition, [Sixth Circuit case] *Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision."

*Skrine*, 2015 WL 5214636, at *14 (alteration added) (internal quotation omitted). "In a case founded upon the opposition clause, it is irrelevant that [formal discrimination] charges have not been filed [with the EEOC]." *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 331 (6th Cir. 2013) (alterations added).

Defendant argues that plaintiff did not oppose an unlawful discriminatory practice because she had Daly's "full support" when she was investigating the complaints of discrimination against Bennett and negotiating a severance package with him. Def.'s Br. at 12; Def.'s Reply at 6. Indeed, the following undisputed evidence shows that Daly did not oppose plaintiff's investigation, her negotiations with Bennett, or her opinion that Bennett should not return to work: Daly (1) adopted plaintiff's recommendation that Bennett be placed on administrative leave and undergo a fit-for-duty evaluation, (2) conditioned Bennett's return to work on him making certain behavioral modifications, (3) participated in initial severance package discussions with Bennett and supported plaintiff's continued discussions with Bennett, (4) signed Bennett's severance agreement, and (5) seriously considered firing Bennett had he not "retired."

Defendant relies on *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 885 (W.D. Ky. 2015), to support its argument that plaintiff's "involvement in or knowledge of co-worker grievances" through her position as human resources director is not protected activity.[10] In *Coleman v. G4S Secure Sols. (USA), Inc.*, No. 16-10250, 2016 WL 7439197, at *5 (E.D. Mich. Dec. 27, 2016), the defendant also relied on *Lewis-Smith* "for its holding that the plaintiff had not

---

[10] Defendant argues that *Lewis-Smith* defeats plaintiff's Title VII claim under the participation clause, but the analysis defendant relies on appears to relate to protected activity under the opposition clause because there is no finding that the protected activity at issue in that case was connected to an EEOC charge. Instead, the protected activity involves plaintiff's knowledge of and alleged involvement with "personnel issues and complaints by others by virtue of her position in the HR Department." *Lewis-Smith*, 85 F. Supp. 3d at 908. As a result, the Court discusses *Lewis-Smith* to analyze plaintiff's claim under the opposition clause.

engaged in a protected activity by investigating another employee's discrimination complaints where such an investigation was part of the plaintiff's job duties." Judge Edmunds discussed this issue as follows:

> In *Lewis-Smith*, the plaintiff appeared to claim "that she engaged in protective (sic) activity on behalf of others for which she received hostile treatment and retaliation." *See id.* at 908. The plaintiff listed in her pleadings "various other employees' grievances against [d]efendant, and her alleged involvement with those grievances, if any." *Id.* As the *Lewis-Smith* court pointed out, other courts have grappled with the issue of claims of retaliation by employees in human resources. *See id.* at 909. One court reasoned that adopting the plaintiff's position – implicitly "that she is entitled to special protection because she had knowledge of numerous personnel issues and complaints by others by virtue of her position in the HR Department and as a member of Staff Council" – "would render practically all of [the plaintiff's] work activities and work product subject to Title VII protection." *Id.* (quoting *Correa v. Mana Prods., Inc.*, 550 F. Supp. 2d 319, 330-31 (E.D.N.Y. 2008)).

> *Lewis-Smith* relies in part on reasoning from the Tenth Circuit to note that "[i]n order for employees in human resources positions to claim retaliation they need to first clearly establish that they were engaged in protected activities other than the general work involved in their employment." *Id.* at 909 (citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996)).

> \* \* \*

> The Second Circuit in *Littlejohn v. City of New York*, shed additional light on "protected activity" in the context of an employee who, as part of his or her job duties, reports or investigates other employees' complaints of discrimination. *See Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015). The *Littlejohn* court looked to *Crawford v. Metropolitan Government of Nashville & Davidson County*, in which the Supreme Court clarified that "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." 555 U.S. 271, 276 (2009) (extending Title VII protection to an "employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation."). *Littlejohn* points out that *Crawford* did not restrict its holding to "non-managers or to employees whose job responsibilities are untethered to monitoring discrimination or enforcing non-discrimination

policies." *Littlejohn*, at 318. Yet even in light of *Crawford*, *Littlejohn* acknowledges that

> There is a significant distinction between merely reporting or investigating other employees' complaints of discrimination, which simply fulfills a personnel manager's daily duties, and communicating to the employer the manager's own "belief that the employer has engaged in . . . a form of employment discrimination," which "virtually always constitutes" opposition notwithstanding the employee's underlying job responsibilities.

*Littlejohn*, at 318 (quoting *Crawford*, 555 U.S. at 276 (internal quotation marks omitted)).

*Id.* at *5-6 (emphasis in original). Judge Edmunds concluded in *Coleman* that the plaintiff failed to show a genuine issue of material fact "that she was acting other than in her capacity as a supervisor in conducting an investigation into the allegations by her subordinates" because "[i]n investigating, she did what she 'usually' does, and her investigation . . . initially came about from fulfilling her managerial duties in dealing with another issue." *Id.* at *7.

Like the plaintiff in *Coleman*, plaintiff in the instant matter has not shown that her investigations of the complaints made by Branch, McClane, and Ivey "were beyond her regular job duties," *Lewis-Smith*, 85 F. Supp. 3d at 909, and she therefore has failed to show that she engaged in protected activity under the opposition clause. Plaintiff argues that the steps she took to address Branch's complaint against Bennett, including informing Daly of her conclusion that Bennett had discriminated against Branch, constitute protected activity. But plaintiff's affidavit makes it clear that she reached her conclusion "[a]fter my investigation" of Branch's complaint, Pl.'s Aff. ¶ 3, and her testimony regarding her conclusion is tied to her investigation of employee complaints as human resources director because she states that it was her conclusion "as far as to an investigation." Pl.'s Dep. at 108. Plaintiff does not dispute that this investigation was part of her job duties, and she does not label her conclusion regarding Bennett's conduct towards Branch

as her own personal belief. Plaintiff has given no indication that her conclusion was her "own 'belief that [defendant] has engaged in . . . a form of employment discrimination,' which 'virtually always constitutes' opposition notwithstanding the employee's underlying job responsibilities." *Coleman*, 2016 WL 7439197, at *6 (quoting *Littlejohn*, 795 F.3d at 318). Even if plaintiff had shown that she engaged in protected activity by addressing Branch's complaint of discrimination against Bennett, she does not make the required showing of a causal connection, as discussed below.

## 2. Causal Connection

Defendant argues that plaintiff cannot establish a causal connection between her alleged protected activity and the adverse employment action because "there is no evidence to suggest that [plaintiff] was terminated because she engaged in protected activity." Def.'s Br. at 15. Defendant asserts that Daly's decision to terminate plaintiff "was motivated by legitimate, nondiscriminatory reasons," – i.e., plaintiff's "abrasive and offensive" communication style and "monolithic" management style. *Id.* at 13. Plaintiff argues that a causal connection is demonstrated based on (1) the "temporal proximity" between Daly having to take measures against Bennett and plaintiff's termination, and (2) the "disparate treatment" plaintiff and Bennett received. Pl.'s Resp. at 23-25.

"'Title VII retaliation claims must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"[11] *Johnson v. Donahoe*,

---

[11] "[F]or claims brought under ELCRA, 'the standard for causation is higher. . . . [T]he plaintiff must show that his participation in activity protected by the [EL]CRA [sic] was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two.' *Kinch v. Pinnacle Foods Grp. LLC*, 266 F. Supp. 3d 1014, 1025 (E.D. Mich. 2017) (quoting *Jennings v. Total Bus Care, Inc.*, No. 09-12235, 2001 WL 1239777, at *1

642 F. App'x 599, 603 (6th Cir. 2016) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). "To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott*, 348 F.3d at 543. "Causation may be inferred from such factors as temporal proximity and differential treatment of similarly situated comparators." *Mitchell v. Per-Se Techs., Inc.*, 64 F. App'x 926, 927 (6th Cir. 2003) (internal citation omitted).

"In analyzing the facts in temporal proximity cases, [the Sixth Circuit] ha[s] always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn." *Johnson*, 642 F. App'x at 607 (internal citation omitted). "[T]he relevance of [the temporal proximity] factor dims as time passes between the alleged act of opposition and the alleged act of retaliation," *Eisenbaum v. Senior Lifestyle Corp.*, 560 F. App'x 496, 499 (6th Cir. 2014), and "[s]ubstantial case law from this [C]ircuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone." *Williams v. Zurz*, 503 F. App'x 367, 373 (6th Cir. 2012) (internal quotation omitted).

The Sixth Circuit has found that periods of two to five months between an employer learning of the protected activity and the adverse employment action are insufficient to establish causation without additional evidence of retaliatory conduct:

> For example, we have held that a temporal proximity of three months, in combination with increased scrutiny of the employee by the employer, is sufficient to show causation at the summary judgment stage. *See Hamilton v. Gen'l Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009). We have also

---

(E.D. Mich. Mar. 30, 2011)). Because plaintiff does not meet Title VII's causation standard, there is no need to address whether she satisfies ELCRA's higher causation standard. Moreover, the Sixth Circuit has found that a "district court did not err in using 'but for' causation to review [a plaintiff's] ELCRA retaliation claim." *Beard v. AAA of Mich.*, 593 F. App'x 447, 452 (6th Cir. 2014).

found that a temporal proximity of just under three months, in combination with verbal threats of termination, was enough to demonstrate a causal link. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). Indeed, we have found that temporal proximity alone is "enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation" only when "an adverse employment action occurs very close in time after an employer learns of a protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity to be sufficient evidence of causation where termination occurred on the same day as employer learned of protected conduct). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*; *see also Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that temporal proximity of "two to five months" between protected conduct and adverse action is insufficient); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (finding that, where employer filed disciplinary notices only weeks after protected conduct and discharged plaintiff within four months of the protected conduct, temporal proximity is insufficient to support an inference of retaliation).

*Id.*

In the present case, plaintiff was terminated in October 2016, but she does not indicate when Daly became aware of her alleged protected activity. She provides no temporal proximity calculation other than saying that the two events happened "a few months" apart. Pl.'s Resp. at 24. The alleged protected activity plaintiff highlights in her response for purposes of calculating temporal proximity seems to be her informing Daly of her conclusion that Bennett had racially discriminated against Branch. She states that temporal proximity exists because "shortly after she forced the issue that finally resulted in disciplinary measures against Bennett, she was suddenly discharged without any explanation." *Id.* at 23. Plaintiff does not provide a date for her conversation with Daly, and she therefore has failed to meet her burden of proving causation through temporal proximity. It is not the Court's role to make plaintiff's case for her, and the Court should not have to search the record for possible points in time when plaintiff may have

spoken to Daly or make guesses as to what plaintiff's temporal proximity calculation might be. Moreover, plaintiff does not point to any other retaliatory conduct to support her temporal proximity argument. Thus, whether plaintiff's conversation with Daly took place shortly before Bennett's administrative leave and psychological evaluation in May 2016 (five months before plaintiff's termination) or around the time when Bennett's severance agreement was signed in August 2016 (two months before plaintiff's termination), a two- to five-month time frame is insufficient, on its own, to demonstrate causation.

Plaintiff also tries to meet her burden of showing causation by arguing that there was "disparate treatment" between her and Bennett. She claims that although Bennett's behavior was "more eg[]regious" than hers and he "was not engaged in protected activity," he was treated "more favorably" than she was because he received warnings for his conduct, while she received no warnings or discipline and was given no explanation for her sudden termination. Pl.'s Br. at 23-25.

As noted above, "[c]ausation may be inferred from . . . differential treatment of similarly situated comparators." *Mitchell*, 64 F. App'x at 927. The Sixth Circuit has stated that

> to be "similarly situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 393 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)). "The proper inquiry is whether the other employees are similarly situated in all relevant aspects." *Hillman v. Shelby Cty.*, 515 F. App'x 365, 372 (6th Cir. 2013) (internal citations omitted). However, "the appropriate test is to look at those factors relevant to the factual context, as opposed to a requirement that a plaintiff demonstrate similarity

in all respects," and the Sixth Circuit has "disapproved of a rigid standard of similarly situated that only took account of job functions."  *Jackson*, 518 F.3d at 394.

In the present case, plaintiff makes no attempt to explain how she and Bennett are similarly situated other than stating that she and Bennett "[b]oth were Directors."  Pl.'s Resp. at 20.  The evidence indicates that when their employment with defendant ended, they both were supervised by Daly and received severance payments that were calculated with "the same formula."  Daly's Dep. at 55-56.  Daly explained that the difference between their severance payments was due to Bennett having worked for defendant for twenty-six years, whereas plaintiff worked for defendant for seven months.  Whether the two of them were "subject to the same standards" and had similar job functions is not clearly established by the evidence, but their job functions were likely different considering that Bennett was the equipment and facilities director and plaintiff was the human resources director and EEO officer.  Plaintiff concedes that their conduct was different in stating that Bennett's was "more eg[]regious" than hers.  Thus, a reasonable juror could not find that plaintiff and Bennett were similarly situated "in all relevant respects" based on the evidence in the record such as to support an inference of causation.

In sum, plaintiff has not established a prima facie retaliation claim because she has not established that she engaged in protected activity and that there was a causal connection between the alleged protected activity and her termination.

Even if plaintiff had established a prima facie retaliation claim, defendant has offered a legitimate, nondiscriminatory reason for her termination.  When a defendant does this, "the burden of persuasion then shifts back to the plaintiff 'to show that the proffered reasons were not the true reasons for the employment decision, *i.e.*, that the reasons were a pretext for retaliation.'"  *Hubbell*, 933 F.3d at 568 (quoting *New Breed Logistics*, 783 F.3d at 1066).  To show

pretext, "the plaintiff must produce enough evidence for a reasonable juror to conclude that the employer's legitimate reason is pretextual because it either: '(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 695 (E.D. Mich. 2015) (quoting *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007)). Plaintiff has not shown that defendant's reasons were pretextual.[12]

Daly testified that he fired plaintiff because of her "abrasive and offensive" communication style and her "monolithic" management style, which were creating a work environment that was "getting worse." Daly received complaints about plaintiff from attorney Derderian, board members, union representatives, department heads, contractors, and employees, all of whom found it very difficult to work with plaintiff. Attorney Derderian testified that "nobody could stand [plaintiff]" and that she "couldn't work with anybody"; union representative Gordon had difficulty dealing with plaintiff "through a curtain of hate"; department head Williams "simply couldn't work with [plaintiff]"; department head Herrick said plaintiff was "tough," "hard," and "brutal"; and department head Dellaposta said plaintiff "was impossible." In addition, the human resources director at Wolverine, "a long time contract person with [defendant]," told Daly that Wolverine would stop doing business with defendant if plaintiff stayed on as human

---

[12] Plaintiff's only reference to pretext in her response is the following general statement:

> Conduct that is insufficient to motivate discharge is evidence of both employer discrimination and pretext. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (plaintiff may show pretext in the same manner as in a disparate treatment theory of discrimination).

Pl.'s Resp. at 23. Plaintiff does not elaborate on why her conduct (i.e., the many complaints about her communication and management style) "is insufficient to motivate discharge" such as to provide evidence of pretext.

resources director.  This is evidence that defendant had a legitimate, nonretaliatory reason for discharging plaintiff, and it remains unrebutted by plaintiff.  Therefore, the Court shall grant summary judgment for defendant on Count I.

<u>Wrongful Termination/Retaliation Claim in Violation of Michigan's Public Policy (Count II)</u>

Plaintiff alleges in Count II that her termination violated Michigan's public policy because it was motivated "in whole or in part" by her enforcement of EEO plan requirements.  She characterizes this enforcement as a "failure or refusal to violate the law in the course of employment."  Compl. ¶¶ 36-38; Pl.'s Resp. 17-18.  Defendant argues that it is entitled to summary judgment because Daly thought plaintiff was an effective EEO officer and supported her changes to EEO plan processing – "even over objection by the Engineering Director," Fred Peivandi.  Def.'s Br. at 17.  Defendant argues that Daly terminated plaintiff's employment "because of her inability to get along with and be respectful toward the other . . . Department Heads, the union representatives, longtime contractors, vendors and suppliers of [defendant], several Commissioners on the Board, and multiple employees from the IT department to Engineering." *Id.*

This Court has explained:

Although Michigan law allows termination of an at-will employee for any legal reason or no reason, Michigan "courts recognize an exception to this rule when the grounds for termination violate public policy."  *Morrison v. B. Braun Medical Inc.*, 663 F.3d 251, 256 (6th Cir. 2011) (citing *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 695, 316 N.W.2d 710, 711 (1982)); *see also Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 486 (6th Cir. 2000) (stating that "[u]nder Michigan law, an employee may have a cause of action against [her] employer when [her] termination is contrary to clearly articulated public policy").  There are three elements to this claim:  (1) the "plaintiff engaged in protected activity"; (2) "plaintiff was discharged"; and (3) "a causal connection exists between the plaintiff's protected activity and the discharge." *Clifford v. Cactus Drilling Corp.*, 419 Mich. 356, 368, 353 N.W.2d 469, 474 (1984) (Williams, C.J, dissenting); *see also Suchodolski*, 412 Mich. at 695-96, 316 N.W.2d at 711-12.

Adverse action against an employee violates public policy under Michigan law if it was "for 'failure or refusal to violate a law in the course of employment.'" *Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004) (quoting *Suchodolski*, 412 Mich. at 695-96, 316 N.W.2d at 711-12). "[A] public-policy violation can be premised on a violation of a federal statute." *Lewandowski v. Nuclear Mgt.*, 272 Mich.App. 120, 128, 724 N.W.2d 718, 723 (2006) (citing *Garavaglia v. Centra, Inc.*, 211 Mich.App. 625, 631, 536 N.W.2d 805, 808 (1995)); *see also Authier v. Ginsberg*, 757 F.2d 796, 798 n.2 (6th Cir. 1985). "To establish a claim of wrongful discharge, a plaintiff must prove that one of the motives or reasons for Plaintiff's discharge or adverse treatment was [her] failure or refusal to violate the law. A plaintiff need not show that the protected trait or activity is the exclusive reason for discharge." *Morrison*, 663 F.3d at 257 (internal quotation marks, citations, and footnote omitted).

*Khami v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 09-11464, 2012 WL 414812, at *22 (E.D. Mich. Feb. 8, 2012).

In the present case, plaintiff has provided no evidence that her enforcement of EEO plan requirements was a reason for her termination. Plaintiff claims that her refusal to waive the requirement that vendors "submit 'goals' for minorities and females" as part of their EEO plan, and her insistence that such "goals" be provided, led to "criticisms [by defendant] that were used as the basis for her termination." Pl.'s Resp. at 20. But plaintiff does not cite to any evidence that supports this assertion. In addition, she does not specify what "criticisms" were made and does not identify what person associated with defendant made them. Plaintiff testified that an unnamed contractor was unhappy with her EEO plan requirements, Pl.'s Dep. at 188, but the only employee of defendant who complained to Daly about plaintiff's handling of EEO plan submissions was Peivandi. As noted above, plaintiff testified that Daly "agreed" with her at a meeting on this issue:

During that conversation, Fred [Peivandi] went on and on about a host of things and commented this is not the way we used to do things, and John Daly responded by saying the way we were doing them was wrong, and you [Peivandi] are no longer to have any communications with any vendor, supplier, contractor regarding EEOC [sic] . . . .

*Id.* at 215-16.

Daly testified that plaintiff's work as EEO officer was an improvement over his own handling of EEO plan submissions as interim human resources director. Daly's Dep. at 48. He testified that he "always" supported plaintiff on the EEO submission process, which included her enforcing the policy as to Peivandi and Plamondon. *Id.* at 45. Plaintiff was never disciplined for her work as EEO officer. She alleges that she was "reprimanded" by Daly to speak more softly to the men in the office after her written communication to Plamondon about a perceived policy violation, but she does not indicate how Daly's comment was tied to her enforcement of the policy, as opposed to the issues Daly testified about regarding her communication and management style.

Although some individuals had positive experiences working with plaintiff, Daly testified that the reason for her termination was her "abrasive and offensive" communication style and "monolithic" management style, which led to "dissatisfaction and acrimony" that was "getting worse." *Id.* at 16. Daly received complaints from attorney Derderian, board members, union representatives, department heads, contractors, and employees regarding plaintiff's communication style. Plaintiff has not provided sufficient evidence to challenge the legitimacy of this legitimate, nonretaliatory explanation for her termination. She has also not shown that her enforcement of EEO plan requirements, which she characterizes as a failure or refusal to violate the law, played any role at all in her discharge. As a result, the Court shall grant summary judgment for defendant on Count II.

### Conclusion

For the reasons explained above,

IT IS ORDERED that defendant's motion for summary judgment is granted.


s/Bernard A. Friedman
Bernard A. Friedman
Senior United States District Judge

Dated:   March 23, 2020
         Detroit, Michigan