# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: May 27, 2021

Ms. Raechel M. Badalamenti
Kirk, Huth, Lange & Badalament
19500 Hall Road
Suite 100
Clinton Township, MI 48038-0000

Mr. Paul R. Bernard
Bernard Legal Services
18600 Northville Road
Suite 400
Northville Township, MI 48168

Ms. Tovah R. Calderon
Ms. Alisa Philo
U.S. Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Washington, DC 20044-4403

Ms. Anne Noel Occhialino
U.S. Equal Employment Opportunity Commission
Office of General Counsel
131 M Street, N.E.
Fifth Floor
5SW20L
Washington, DC 20507

Re: Case No. 20-1334, *Makini Jackson v. Genesee County Road Commission*
Originating Case No. : 2:18-cv-11199

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0117p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MAKINI JACKSON,

                           *Plaintiff-Appellant*,

      *v.*

GENESEE COUNTY ROAD COMMISSION,

                           *Defendant-Appellee*.

> No. 20-1334

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:18-cv-11199—Bernard A. Friedman, District Judge.

Argued: January 14, 2021

Decided and Filed: May 27, 2021

Before: SILER, COLE, and GIBBONS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Paul R. Bernard, BERNARD LEGAL SERVICES, Plymouth, Michigan, for Appellant. Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton Township, Michigan, for Appellee. Alisa C. Philo, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Paul R. Bernard, BERNARD LEGAL SERVICES, Plymouth, Michigan, for Appellant. Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton Township, Michigan, for Appellee. Alisa C. Philo, Tovah R. Calderon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiff Makini Jackson appeals the district court's grant of summary judgment to her former employer defendant Genesee County Road Commission ("GCRC").  Jackson claims that GCRC terminated her employment in retaliation for her investigations of employees' claims of racial discrimination and her attempts to ensure that GCRC's contracts complied with equal employment opportunity regulations.  The district court granted GCRC's motion for summary judgment because it found that Jackson had failed to prove that she engaged in protected activity and had not established causation.  Because Jackson engaged in protected activity and there remains a genuine factual dispute as to causation, we reverse.

### I.

On March 31, 2016, GCRC hired plaintiff Makini Jackson, an African American woman, to be the Director of Human Resources and Administrative Services (the "human resources director").  Jackson initially interviewed with a panel of GCRC employees who then recommended to John Daly, GCRC's chief administrative officer, that she be hired.  Daly was Jackson's direct supervisor while she was employed at GCRC.  Before Jackson was hired, Daly had been serving as the interim human resources director in addition to his role as chief administrative officer.

There were several pending internal discrimination complaints when Jackson began as the human resources director.  Daly had addressed some of the complaints when he was interim human resources director with the assistance of outside counsel Tom Derderian, but, according to Jackson, the complaints had not been investigated or resolved to the satisfaction of the complainants.  The first set of complaints involved John Bennett, the director of equipment and facilities at the time.  Several African American employees—Anthony Branch, Felicia Ivey, and Joyce McClane—complained about Bennett's behavior towards them.  Jackson investigated each claim, including facilitating a conversation between Ivey and Bennett and talking to Bennett on

Branch's behalf. Jackson concluded that Bennett was discriminating against Branch because of his race. She did not reach a conclusion regarding McClane's or Ivey's claims. She described Bennett's behavior as erratic and recommended to Daly that Bennett be put on administrative leave and undergo a psychiatric evaluation. Daly agreed.

As a result of his psychiatric evaluation, Bennett was cleared to return to work. On July 1, 2016, GCRC's outside counsel, Tom Derderian, sent Bennett a letter informing him that he was allowed to return to work under specific conditions including "respect[ing] the authority of [his] co-workers" and being "polite, pleasant and professional." DE 14, Ltr., Page ID 280–81. Bennett sent a handwritten reply "correcting" Derderian's characterization of his conduct and arguing that he had "always treated [his] coworkers and supervisors with respect and dignity." *Id.* at 281. At that point, Jackson, Daly, and Derderian began having conversations about whether Bennett should still be allowed to return to work.

Branch and McClane emailed Jackson and expressed their displeasure that Bennett was returning. Branch stated that the GCRC was "knowingly fostering and condoning a hostile work environment by John Bennett directed at me" and requested a formal EEOC complaint form. DE 15-7, Email, Page ID 399–400. McClane requested an EEOC complaint form and stated that she thought there was a "hostile work environment" at GCRC. DE 15-8, Email, Page ID 404–06. Ivey later stated that she believed she requested an EEOC complaint at the same time. In his deposition, Derderian said that he was ready to fire Bennett after reading Bennett's response to his letter. Jackson recalled things differently in her deposition. She stated that she "was pro [Bennett] not returning" but that "was not what John Daly and Tom Derderian [were] agreeing with initially." DE 14, Jackson Dep., Page ID 246.

Eventually, Daly, Derderian, and Jackson agreed that Jackson would negotiate a severance package with Bennett. Jackson successfully negotiated the severance, and Daly and the Board of Commissioners approved the agreement. Afterwards, Daly "counseled" Jackson because she exceeded the wage cap Daly had set before the negotiations but also praised her negotiation skills and flexibility in the negotiations. DE 14, Daly Dep., Page ID 162. Bennett's severance agreement was finalized on August 16, 2016.

The second set of complaints involved Melissa Williams, GCRC's finance director. On September 27, 2016 McClane informed Jackson that for over two years she had been "repeatedly harassed, retaliated, discriminated [against] and work[ed] in a hostile environment," and "[n]othing [had] ever been done to rectify [her] situation." DE 15-10, Email, Page ID 414–15. According to Jackson, Williams made McClane feel uncomfortable and sent her e-mails Jackson believed were inappropriate and intrusive. Jackson attempted to resolve the situation by requiring Williams to send all communications to McClane through her as an intermediary. Jackson also asked the human resources director for Genesee County to conduct an independent review of McClane's complaints since Jackson was McClane's direct supervisor and she wanted to avoid any appearance of bias. Finally, because Williams did not stop communicating directly with McClane, Jackson scheduled a meeting with Daly, two county commissioners, and Williams to address McClane's complaints. Shortly after that meeting, Williams resigned from the GCRC.

In addition to handling employee complaints, Jackson was the Equal Employment Opportunity ("EEO") Officer and approved the Equal Employment Opportunity Plans ("EEOPs") submitted by vendors and contractors who worked with GCRC. Before Jackson was hired, Daly and Rachel Mullin, another GCRC employee, approved the EEOPs. In this arrangement, Mullin reviewed the proposals and Daly made the final decision. Daly conceded that he did not know whether Mullin had any training related to EEOPs and that he "frankly probably wasn't very good" at evaluating the plans himself. DE 14, Daly Dep., Page ID 178–79. Mullin confirmed that she did not have any formal training but did consult GCRC's outside counsel to ask "if there were certain rules" vendors needed to follow to have their EEOPs approved. DE 15-36, Mullin Dep., Page ID 634–35. Mullin said that she followed up with vendors if they did not fully fill out the EEOP and then gave the proposals to Daly for final approval.

When Jackson took over the management of EEOPs she realized that several vendors' EEOPs had expired, and she was concerned that some GCRC directors were conducting business with vendors before their EEOPs were approved. She claimed that Fred Peivandi, the director of engineering, and John Plamondon, the director of construction, were "colluding and

communicating with potential bidders, contractors and suppliers before they had submitted all the required documentation to even be considered for a contract with the road commission, and they should not have had any communication with [vendors] before" their EEOPs were approved. DE 14, Jackson Dep., Page ID 258. At a board meeting in August of 2016, Jackson objected when Peivandi tried to put forth a contract for approval from a vendor who had not completed its EEOP. The board delayed voting on the contract until the vendor's EEOP was approved, and the contract was later approved.

Jackson implemented several changes in GCRC's EEOP approval process. Jackson admitted that the substance of GCRC's original policy was not deficient, but she wanted to centralize and control GCRC's communication with vendors. Jackson believed that it was important that all communication go through her to avoid a display of favoritism or "the appearance of collusion or criminal behavior." DE 14, Jackson Dep., Page ID 264. She edited the EEOP Submission Instructions to include instructions that all entries must be typed and all questions directed only to the EEOC Officer. She informed vendors that if they did not comply with the instructions, she would "request the Board of Commissioners of the GCRC order the cancellation of the contract found to be in violation, and/or declare the vendor, bidder, supplier or contractor ineligible for any future contracts with the GCRC until they have complied." *Id.* at 436. Jackson also emailed the GCRC directors and informed them that "[a]ny and all questions regarding the EEO Plan Policy and Process . . . must be directed solely to the EEOC Officer/Human Resources and Administrative Services Director." DE 15-18, EEOP Email, Page ID 437–39. She implemented her new policies in July of 2016.

During Jackson's time at GCRC, several employees, vendors, board members, and union representatives complained to Daly about Jackson. According to Daly, two board members expressed concerns that "they had received complaints from outside parties and from employees related to [Jackson's] communication style." DE 14, Daly Dep., PageID 164. Another board member objected to Jackson's "communication style and abrasiveness and the manner in which she treated Tom Derderian." *Id.* at 165. Derderian himself had multiple complaints about Jackson. He complained that Jackson did not understand that his client was the GCRC and that he did not work for her. He objected to Jackson's request that all his communication with GCRC

employees go through her, which Derderian claimed interfered with his ability to do his job. Derderian told Daly that the inability to reach out to individual employees was preventing him from adequately preparing for cases and arbitrations that GCRC was involved in at the time. Derderian also complained that Jackson rewrote Bennett's severance package without his permission.  In response, Daly told Jackson that she needed to give Derderian more access to GCRC employees and reminded her that Derderian's client was the GCRC.

Every department director at GCRC except Branch—including Bennett, Williams, Peivandi, and Plamondon—complained about Jackson's communication style.  Bennett, Williams, Peivandi, and two other directors all complained about Jackson's abrasive and inflexible communication style.  Peivandi also complained that Jackson was not handling EEOPs in a timely manner, which created problems arranging engineering projects for the upcoming construction season.  Daly, however, supported Jackson when Peivandi complained about the EEOC process.  Plamondon complained about the way Jackson treated the employees who worked in his department.   Other employees also reported problems with Jackson's communication style.

In September 2016, two union representatives reported that Jackson was abrasive, offensive, rigid, and difficult to work with.  Two vendors also complained about Jackson.  They told Daly that Jackson made them submit multiple drafts of EEOPs and made them "change things on the second submission that hadn't been addressed in the first."  DE 14, Daly Dep., Page ID 180.  They also found Jackson difficult to work with and complained that she did not return their messages in a timely manner.  One of the contractors was so concerned that, according to Daly, "they said if Ms. Jackson continued as the HR director, that they were going to not do business with the Road Commission."  *Id.* at Page ID 181.  Additionally, Daly said that one contractor complained that Jackson had put a hold on the contractor's payment because of a human resources issue, which Jackson was not authorized to do.  Jackson denies ever putting a hold on payments.

Other employees, however, reported that they had good experiences working with Jackson.  Branch reported that he had an "excellent" working relationship with Jackson.  DE 14, Branch Dep., Page ID 303.  Branch acknowledged that he heard negative comments about

Jackson from employees in other departments, but he said he never received complaints from employees in his department, which was the largest department at GCRC. Ivey stated that she had a good working relationship with Jackson and did not hear others complain about her. Ronald Latimer, a lead GCRC supervisor, also reported that he had a great working relationship with Jackson. Latimer said that Jackson was the most transparent director he had dealt with and she "was always up front whenever you had to deal with a problem or a situation." DE 15-37, Latimer Dep., Page ID 668. According to Latimer, he never expressed concerns or complaints about Jackson to anyone, which contradicts Daly's statement that Latimer complained to him about Jackson. Finally, Daly himself acknowledged that Jackson was doing a good job in some aspects of her job, including improving the EEOP policies. Board member Cloyce Dickerson stated that Daly told him he thought Jackson was doing a great job about two weeks before Daly told Dickerson he had decided to terminate Jackson's employment.

Daly fired Jackson in October of 2016. Derderian stated that a few weeks before Jackson was ultimately let go Daly told him that he had made the decision to terminate her because "nobody could stand her, she couldn't work with anybody, [and] he had a riot on his hands with a lot of suppliers." DE 14, Derderian Dep., Page ID 131. According to Derderian, Jackson had not "settle[d] down" like Daly had hoped, and Daly "was fed up with her and he was letting her go." *Id.* Daly intended to fire Jackson on a Friday, but because of a communication issue he fired her the following Monday on October 17, 2016. Daly did not give Jackson a reason for her termination other than she was an at-will employee.

On May 17, 2017, Jackson filed an EEOC charge against GCRC. Jackson claimed that she believed she "was discharged in retaliation for engaging in a protected activity in violation of Title VII" including "addressing charges of discrimination by African American employees that had been previously ignored" and "inform[ing] the Board that staff members were violating EEO policies when hiring contractors." DE 18, EEOC Charge of Discrimination, Page ID 694. The EEOC issued a right to sue letter on January 17, 2018, and Jackson filed her complaint in district court on April 16, 2018. She brought two claims: a retaliation claim under Title VII of the Civil Rights Act of 1964 and Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), and a claim of wrongful termination in violation of public policy under Michigan law.

The district court granted GCRC's motion for summary judgment for both claims. The district court concluded that the retaliation claim failed because Jackson had not demonstrated that she engaged in protected activity and, even if she did engage in protected activity, GCRC had a legitimate, nondiscriminatory, nonpretextual justification for her termination. Similarly, the district court held that the public policy claim failed because Jackson did not prove causation. Jackson timely appealed.

## II.

"We review a district court's grant of summary judgment de novo." *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (quoting *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 486 (6th Cir. 2006)). Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)). The court must view the facts in the record and the reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A genuine issue of material fact exists when there are 'disputes over facts that might affect the outcome of the suit under the governing law.'" *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Summary judgment is not proper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.

### A.

Jackson's first claim is that GCRC terminated her employment in retaliation for engaging in protected activity in violation of both Title VII and ELCRA. Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Similarly, ELCRA states:

> Two or more persons shall not conspire to, or a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

Mich. Comp. Laws § 37.2701.

The plaintiff must demonstrate four elements to establish a prima facie case of retaliation under both Title VII and ELCRA: (1) she engaged in protected activity, (2) the defendant was aware of the protected activity, (3) "the defendant took an action that was 'materially adverse' to the plaintiff," and (4) there is a causal connection between the plaintiff's protected activity and the defendant's adverse action.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)) (articulating the prima facie case under Title VII); *see also El-Khalil v. Oakwood Healthcare, Inc.*, 504 Mich. 152, 160–61 (Mich. 2019) (per curiam) (articulating the prima facie case under ELCRA).[1]

The plaintiff may prove retaliation either through direct evidence or circumstantial evidence.  *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019).  If the plaintiff relies on circumstantial evidence, her claims are evaluated using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Redlin*, 921 F.3d at 613.  Under *McDonnell Douglas*, if the plaintiff establishes her prima facie case then the burden shifts to the defendant to demonstrate some "legitimate, nondiscriminatory reason" for its action.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant produces such a reason, the burden shifts back to the plaintiff to show that the proffered reason was a mere pretext for discrimination.  *Id.* at 804.  The ultimate burden, however, remains with the plaintiff to convince the factfinder that the defendant retaliated against her for engaging in protected activity.  *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014).

---

[1]In the past we have described the legal standard for a retaliation claim under Title VII and ELCRA as identical.  *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) ("[T]he ELCRA analysis is identical to the Title VII analysis.").  There are two instances, however, where the parties claim Title VII and ELCRA differ.  *See infra* Part III.A.1.b, Part III.A.3.

1.

      a.

Jackson claims that she engaged in protected activity both under the opposition clause of Title VII and ECLRA and under the participation clause of ECLRA. Jackson argues that she engaged in protected activity under the opposition clause when she: (1) investigated and managed employees' complaints of racial discrimination, and (2) changed GCRC's EEOP approval process to ensure compliance with equal employment opportunity requirements. The district court found that neither activity qualified as a protected activity because Jackson's conduct did not go beyond her regular job duties as human resource director and because Daly expressed support for Jackson's efforts. On appeal, Jackson and the United States as amicus curiae argue that a human resources employee does not have to prove that she engaged in conduct outside her job responsibilities to maintain a claim under Title VII's opposition clause. We agree.

The opposition clause of Title VII makes it "unlawful . . . for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . . by this [title.]" 42 U.S.C. § 2000e-3(a). The Supreme Court has held that the term "oppose" should be interpreted based on its ordinary meaning: "[t]o resist or antagonize . . . ; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (alteration and omission in original) (quoting Webster's New International Dictionary 1710 (2d ed. 1957)). Examples of opposition activity protected under Title VII include "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; [and] refusing to obey an order because the worker thinks it is unlawful under Title VII." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000)); *see also Crawford*, 555 U.S. at 276 ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." (internal quotation marks and emphasis omitted)).

This court and the Supreme Court have imposed limited restrictions on what activity constitutes opposition activity. While the plaintiff's allegations of protected activity do not need to "be lodged with absolute formality, clarity, or precision," the plaintiff must allege more than a "vague charge of discrimination." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (first quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 544 F. App'x 624, 631 (6th Cir. 2013; then quoting *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). The plaintiff also must express her opposition in a reasonable manner. *Johnson*, 215 F.3d at 580. For example, "[a]n employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." *Booker*, 879 F.2d at 1312. Finally, the plaintiff herself must have a "reasonable and good faith belief that the opposed practices were unlawful." *Johnson*, 215 F.3d at 579 (quoting *EEOC Compliance Manual,* (CCH) ¶ 8006).

In addition to these restrictions, the district court held that the opposition clause is limited to conduct that goes beyond the plaintiff's regular job duties. However, the district court's assertion is contrary to both the text of the opposition clause and this court's interpretation of Title VII for two reasons. First, the text of § 2003e-3(a) states that it "shall be an unlawful employment practice for an employer to discriminate against *any* of his employees," which suggests that all employees are subject to the same standard. 42 U.S.C. § 2003e-3(a) (emphasis added). The statute also does not state that the employee's conduct must fall outside of her regular job duties. *See id.*

Second, this court has previously allowed plaintiffs to bring a retaliation claim for conduct related to their job responsibilities. *See Johnson*, 215 F.3d at 579–580; *see also Warren v. Ohio Dep't of Pub. Safety*, 24 F. App'x 259, 265 (6th Cir. 2001). In *Johnson*, the vice president of human resources brought a Title VII claim against the University of Cincinnati for allegedly firing him in part because of his advocacy on behalf of minorities related to his management of the university's affirmative action program. *Johnson*, 215 F.3d at 566. The *Johnson* court found that "the fact that Plaintiff may have had a contractual duty to voice [his concerns about the affirmative action program] is of no consequence to his claim." *Id.* at 579. Excluding the vice president from the protection of Title VII would "run[] counter to the broad

approach used when considering a claim for retaliation under this clause, as well the spirit and purpose behind Title VII as a broad remedial measure." *Id.* at 580. The court worried that narrowing the scope of Title VII could create perverse incentives for employers and leave the employees specifically hired to do the often difficult work of combating discrimination with fewer protections than general employees. *See id.* ("[T]he district court allows for an employer to retaliate against the person best able to oppose the employer's discriminatory practices . . . without fear of reprisal under Title VII. . . . [T]he individual who has contracted to advocate on behalf of women and minorities has not thereby contracted to be retaliated against for his advocacy."). In sum, both the text of Title VII and our precedent reject the district court's additional restriction that the opposition clause does not extend to an employee's regular job duties.[2]

Alternatively, GCRC argues that this court should extend the Fair Labor Standards Act ("FLSA") manager rule to claims brought under Title VII. Under the FLSA manager rule, conduct undertaken while performing assigned human resource jobs and "undertaken for the purpose of protecting the interests of the employer" is not protected activity. *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011); *see also McKinnon v. L-3 Commc'ns Corp.*, 814 F. App'x 35, 43 (6th Cir. 2020). There are good reasons, however, not to extend the FLSA manger rule to Title VII claims. First, the text of FLSA and Title VII are different; notably, the FLSA does not include an opposition clause. *Compare* 42 U.S.C. § 2000e-3(a), *with* 29 U.S.C. § 215(a)(3). Second, as previously explained, the text of Title VII and this court's Title VII precedent contradict the FLSA manager rule. Third, other circuits have been wary of extending the manager rule to Title VII claims. *See, e.g.*, *Littlejohn v. City of N.Y.*, 795 F.3d 297, 317 n.16 (2d Cir. 2015) (declining to extend the manager rule but limiting the opposition clause to plaintiff's conduct that actively supports employees

---

[2]In reaching the wrong conclusion, the district court relied heavily on *Coleman v. G4S Secure Sols. (USA), Inc.*, No. 16-10250, 2016 WL 7439197 (E.D. Mich. Dec. 27, 2016) and *Lewis-Smith v. W. Ky. Univ.*, 85 F. Supp. 3d 886 (W.D. Ky. 2015), to support its proposition that Jackson's conduct was not protected activity under the opposition clause. The district courts in both *Coleman* and *Lewis-Smith*, however, relied on out-of-circuit precedent to support their conclusion that conduct related to an employee's regular job duties is not protected activity. *Coleman*, 2016 WL 7439197, at *6–7; *Lewis-Smith*, 85 F. Supp. 3d at 908–09. Courts cannot rely on persuasive authority from other circuits when there is published precedent in our court stating that a contractual duty to oppose discrimination does not defeat a plaintiff's claim under Title VII. *See Johnson*, 215 F.3d at 579.

asserting claims of discrimination or personally complains); *Collazo* v. *Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 49 n.5 (1st Cir. 2010). *But see Brush* v. *Sears Holdings Corp.*, 466 F. App'x 781, 787 (11th Cir. 2012) (applying the FLSA manager rule to a Title VII harassment claim). Thus, the FLSA manger rule is not a bar to Jackson's retaliation claim under the opposition clause of Title VII.

When viewing the facts in the light most favorable to Jackson, a reasonable juror could conclude that she engaged in protected activity. To bring a successful claim under the opposition clause, Jackson must allege facts that she opposed unlawful GCRC practices in a reasonable manner and with a reasonable and good faith belief that the practices violated Title VII. *Johnson*, 215 F.3d at 579. Jackson argues that she engaged in two types of such protected activity: investigating the discrimination complaints against Bennett and Williams and ensuring EEO compliance.

There is insufficient evidence to show that Jackson's investigation into Ivey's and McClane's complaints of discrimination amounted to protected activity. Jackson admits that she did not reach a conclusion as to whether Bennett was discriminating against Ivey or McClane because of their race. Similarly, Jackson could not say whether Williams was discriminating against McClane because of McClane's race or because of other conflicts between the two employees. Without a reasonable, good faith belief that Williams and Bennett were discriminating against Ivey and McClane because of their protected status, Jackson's investigation into their complaints was not protected activity under Title VII.

Jackson's investigation of Branch's complaints against Bennett, however, was protected activity. Jackson stated that she had a subjective belief based on her investigation that Bennett was discriminating against Branch because he was African American. Jackson then took several steps to oppose Bennett's conduct including investigating Branch's claims, expressing her concerns to Daly, arranging Bennett's administrative leave, and ultimately negotiating his severance agreement. Jackson's reasonable actions to oppose unlawful discrimination perpetuated by Bennett against Branch are sufficient to establish protected activity.

Additionally, a reasonable juror could find that Jackson's conduct as EEO Officer was protected activity. According to Jackson, when she began her employment, GCRC directors were colluding and communicating with vendors before the vendors' EEOPs were approved and contractors with expired EEOPs were permitted to do business with GCRC. To correct these alleged problems, Jackson centralized EEOP communications and ensured all vendors had a current EEOP on file. Jackson also objected at a GCRC board meeting when Peivandi called for a vote on a contract from a vendor that had not completed its EEOP. Jackson's actions could reasonably be viewed as steps to ensure there was no discrimination in hiring both within GCRC and among its vendors, and, thus, were protected activity under Title VII.

Finally, the GCRC appears to argue that Jackson cannot prove that she engaged in protected activity because Daly expressed support for her negotiations with Bennett and for her changes to the EEOP policies. The fact that Daly did not voice his disapproval of Jackson's actions to oppose unlawful activities at GCRC, however, does not mean that Jackson did not oppose discrimination as an initial matter. Whether Daly approved of Jackson's conduct may be relevant when considering causation, but Daly's approval or disapproval does not change whether Jackson's conduct is protected activity.

       b.

Jackson also argues that her conduct is protected activity under the participation clause of ELCRA.[3] Jackson claims that ELCRA's participation clause, unlike Title VII, does not require participation "in an investigation pursuant to a formal charge with an administrative agency." R. 13, Appellant Br., 43 (citing *Holmes v. Haughton Elevator Co.*, 272 N.W.2d 550 (Mich. 1978); *Pompey v. GMC*, 189 N.W.2d 243 (Mich. 1971); *White v. Elec. Data Sys. Corp.*, 974 F.2d 1339, 1992 WL 209355 (6th Cir. 1992) (unpublished table opinion)); *see also* MICH. COMP. LAWS § 37.2701.

---

[3]Jackson appears to acknowledge that her conduct is not covered by the participation clause of Title VII because her conduct was not related to an investigation of a formal EEOC charge. *See Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003) ("Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge.").

Jackson's argument is misguided. None of the cases she cites allow a plaintiff, as she claims, to bring suit under ELCRA's participation clause for participating in another employee's informal discrimination complaints. In both *Holmes* and *Pompey*, the Michigan Supreme Court found that the plaintiff could maintain a civil rights complaint independent of the civil rights statute applicable at the time. *Holmes*, 272 N.W.2d at 551; *Pompey*, 189 N.W.2d at 251–52. Neither case commented on the prerequisites to bring a claim under the ELCRA. *Holmes*, 272 N.W.2d at 551; *Pompey*, 189 N.W.2d at 251–52. In fact, the ELCRA did not yet exist when *Pompey* was decided. *See White*, 1992 WL 209355, at *4. Furthermore, in *White* this court stated that the "separate common law remedy for racial discrimination recognized in *Pompey* did not survive the enactment of [ELCRA]." *Id.* The two other cases Jackson cites, *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646 (Mich. 2005) and *Galeski v. City of Dearborn*, 435 F. App'x 461 (6th Cir. 2011), are similarly inapplicable. In *Garg*, the plaintiff filed an internal complaint alleging a violation of ELCRA after her employer allegedly discriminated against her because of her national origin. *Garg*, 696 N.W.2d at 652, 655. Here, Jackson did not file an internal complaint with GCRC on behalf of herself and none of the complaints filed by GCRC employees specifically alleged ELCRA violations. Similarly, in *Galeski*, the plaintiff filed an internal complaint on his own behalf rather than on behalf of someone else. *Galeski*, 435 F. App'x at 469.[4] Like Title VII, ECLRA "prohibits employers from retaliating against an employee . . . because he has filed or has participated in a *formal* charge or investigation concerning a violation." *Shaull v. Mich. Affiliated Health Care Sys., Inc.*, No. 202582, 1998 WL 1989810, at *4 (Mich. Ct. App. Sept. 22, 1998) (unpublished) (per curiam) (emphasis added). Thus, Jackson has not met her burden of showing that her conduct amounts to protected activity under the participation clause of the ELCRA.

2.

For the first time on appeal, GCRC argues that the second factor, knowledge of the protected activity, is also in dispute. GCRC, however, failed to contest the knowledge

---

[4]Furthermore, *Galeski* appears to suggest that Title VII and ELCRA had identical definitions of protected activity. *Galeski*, 435 F. App'x at 469 n.6. If that is the case, then Jackson's ELCRA claim fails for the same reason her claim fails under Title VII's participation clause. *See Abbott*, 348 F.3d at 543.

requirement before the district court.  A party waives any arguments on appeal that it does not raise before the district court.  *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 614–15 (6th Cir. 2014).  This court excuses waiver "only when it 'would produce a plain miscarriage of justice' or when there are exceptional circumstances that militate against finding a waiver."  *Id.* at 615 (quoting *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008)).  GCRC has not explained why this case falls within the rare exception to waiver.  Furthermore, even if we were to address GCRC's argument, there is ample evidence to suggest that the knowledge requirement is met in this case.  Accordingly, GCRC's challenge to the knowledge element of Jackson's retaliation claim fails.

    3.

    Lastly, Jackson must demonstrate that there was a causal connection between her protected activity and the adverse employment action taken against her, meaning that but-for her protected activity, her employment would not have been terminated.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .").[5]  "At the prima facie stage, this burden 'is not onerous,' and can be met through 'evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'"  *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

    Causality can be shown with either direct evidence or circumstantial evidence.  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543–44 (6th Cir. 2008).  "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action."  *Id.* (citing *Abbott*, 348 F.3d at 542).  If there is

---

[5]GCRC argues that under the ELCRA Jackson must prove not only that her protected activity was a but-for cause of her termination but also that her protected activity was a significant factor in GCRC's decision to terminate her.  The one Michigan court of appeals decision GCRC relies on to make this claim, however, only cites two outdated opinions from this court.  *Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001) (citing *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 929 (6th Cir. 1999); *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 199 (6th Cir. 1986)).  Since *Jacklyn* and *Polk*, this court has found that the causation element of Title VII and the ELCRA are the same.  *See Redlin*, 921 F.3d at 614 n.9.  Furthermore, the Michigan Supreme Court does not mention a significant factor requirement to prove causation under ECLRA.  *See El-Khalil*, 504 Mich. at 160–61; *Garg*, 696 N.W.2d at 660.

direct evidence, then "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Yazdian*, 793 F.3d at 648. If the plaintiff alleges only circumstantial evidence, then she must meet the *McDonnell Douglas* burden-shifting test, meaning that she must establish her prima facie case and then, if the defendant provides a nondiscriminatory reason for her termination, prove that the employer's reason is pretextual. *Imwalle*, 515 F.3d at 544.

A reasonable juror could find that Jackson has established a prima facie case of causation through circumstantial evidence including the temporal proximity between Jackson's protected activity and termination and other evidence connecting Jackson's actions and termination.[6] Temporal proximity between the protected activity and the adverse employment action is an important category of circumstantial evidence. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 664–65 (6th Cir. 2020). In the past, this court has "denied summary judgment where a defendant took adverse action against a plaintiff just a few months after learning of his or her protected activity." *Id.* (collecting cases).

Derderian sent Bennett a letter on July 1, 2016, explaining the conditions for Bennett's return to employment at GCRC after administrative leave. On July 14, 2016, Branch emailed Jackson and told her that he considered allowing Bennett to return from leave to be "a blatant statement and support of [Bennett's] hostile and discriminatory behavior, and a justification of the violation of [his] civil rights." DE 15-7, Email, Page ID 399–400. Around the same time, Daly, Derderian, and Jackson began discussing negotiating a severance agreement with Bennett. Bennett's severance agreement was finalized on August 16, 2016, two months and one day before Jackson was fired. Jackson was also communicating with vendors about EEOP compliance in the months leading up to her termination. For example, on August 19, 2016, Jackson sent an email to Wolverine Sealcoating, a GCRC vendor, explaining that Wolverine's EEOP was not approved because, among other issues, Wolverine did not list a minority goal for

---

[6]For the first time on appeal, Jackson claims that she presented direct evidence of retaliation against her. Jackson argues that "[w]hen he identified the reasons for [her] discharge, Daly noted a number of instances of Jackson's 'confrontational' or 'abrasive' style of communication," and "many of these instances involved Jackson's protected activity." R. 13, Appellant Br., 46. However, like GCRC's challenge to the knowledge requirement, Jackson has waived this argument on appeal because she did not claim direct evidence of discrimination before the district court. *See Scottsdale Ins. Co.*, 513 F.3d at 552; *Hayward*, 759 F.3d at 615.

office staff and did not disclose whether it had been found guilty of a violation of employment civil rights laws.  The temporal proximity between Jackson's protected activities and her termination is strong circumstantial evidence.  In addition, many of the same people who complained to Daly about Jackson's communication style were involved either in the negotiations with Bennett, such as Derderian, or communication about EEOPs, such as Plamondon, Peivandi, and two outside vendors.  A reasonable juror could infer that these individuals described Jackson's communication style as offensive and abrasive because they took issue with her handling of the investigation into Bennett's or Jackson's efforts to ensure EEOP compliance.  Thus, Jackson has met the relatively light burden of demonstrating causation at the prima facie stage.

Next, the burden shifts to GCRC to proffer a legitimate, nondiscriminatory reason for Jackson's termination.  *McDonnell Douglas*, 411 U.S. at 802.  GCRC contends that the nondiscriminatory reason that it fired Jackson was her "communication style and the resulting acrimony it was creating within GCRC."  R. 26, Appellee Br., at 41.[7]  Daly testified that Jackson was "abrasive and offensive to people," inflexible, and monolithic.  DE 14, Daly Dep., Page ID 157.  He also said that he received complaints about Jackson from three board members, two union representatives, all the GCRC department heads except Branch, other employees, and several outside contractors.  This nondiscriminatory reason is enough to meet GCRC's burden on the second step.  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (explaining the defendant's burden as "merely one of production, not persuasion").

Next, Jackson must show that GCRC's proffered nondiscriminatory reason—that her communication and management style was abrasive and offensive—was pretextual.  Jackson "can show pretext in three interrelated ways: (1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [the

---

[7]The GCRC also claims that "the final straw" came when Daly learned the day before Jackson was terminated that she had withheld a payment to a vendor, which Jackson did not have the authority to do.  R. 26, Appellee Br., at 42.  This alleged infraction cannot be used as a reason for Jackson's termination, however, because Daly stated elsewhere that he made the decision to terminate Jackson before he learned of the withheld payment. Additionally, Jackson disputes the allegation that she withheld any payments, so GCRC cannot rely on that fact to succeed at the summary judgment stage.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

proffered reason was] insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). At its core, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* at 400 n.4. The plaintiff's "burden is not heavy," and "summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual." *George*, 966 F.3d at 462 (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547–48 (6th Cir. 2004)). "Where . . . there are two reasonable interpretations of the evidence, we must allow the jury to resolve the issue of whether the evidence [Jackson] cites is sufficient evidence to conclude that [GCRC] retaliated against [Jackson] for opposing an unlawful employment practice." *Yazdian*, 793 F.3d at 649.

A reasonable juror could conclude that GCRC's proffered reason for firing Jackson was pretextual. To be sure, the record includes evidence that suggests some employees found Jackson difficult to work with, which support's GCRC's claim that Jackson was fired because of her difficult communication style. Daly stated that many GCRC directors including Bennett, Peivandi, Williams, Plamondon, Herrick, and Adams complained to him that Jackson's communication style was abrasive and inflexible. Daly also said vendors had complained that Jackson did not respond in a timely manner to their questions and that she provided inconsistent feedback on EEOPs. One vendor even threatened that "if Ms. Jackson continued as the HR director, that they were going to not do business with the Road Commission." DE 14, Daly Dep., Page ID 181. Derderian, GCRC's outside counsel, complained that Jackson limited his ability to speak to GCRC employees about critical legal issues and made it difficult for him to adequately prepare for trials and depositions. Derderian claimed that some union members had complained to him as well that Jackson was "extremely difficult." DE 14, Derderian Dep., Page ID 123. Taken together, these facts could lead a jury to find that GCRC in fact fired Jackson because of her abrasive communication style.[8]

---

[8]GCRC also argues that the court may infer a lack of discrimination because the same person, Daly, hired and fired Jackson. R. 26, Appellee Br., 39 (citing *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463–64 (6th Cir. 1995). While the fact that Daly hired and fired Jackson is relevant, it is not strong evidence in a case like this where Jackson claims that she was retaliated against because of protected activity she undertook as human resource director rather than because of her own protected status. Additionally, Daly acknowledges that he hired Jackson based on the recommendation of the interview panel, not based on his independent consideration of the candidates.

Other facts in the record, however, cut against GCRC's proffered reason. Several GCRC employees and one GCRC board member reported having good working relationships with Jackson. Branch reported that he had an "excellent" work relationship with Jackson and said that no one from his department, which was the largest at GCRC, had complained to him about Jackson. Ivey also had a "good working relationship" with Jackson and had never heard complaints about Jackson's communication style. DE 15-34, Ivey Dep., Page ID 553–54. Latimer reported that he had a great working relationship with Jackson and did not have any concerns about her communication style. Dickerson, a GCRC board member, stated that he never heard complaints about Jackson. This evidence contradicts GCRC's claim that Jackson's communication style was inflexible and abrasive and could lead a juror to conclude Jackson's communication style was not the true reason she was fired.

Furthermore, several of the GCRC employees who complained about Jackson's communication style also complained about Jackson's protected activities, so a reasonable juror could conclude that their complaints about Jackson's style were motivated to some degree by their opposition to her protected activities. For example, Jackson investigated Branch's complaints about Bennett and ultimately negotiated Bennett's severance agreement. It would be reasonable to infer that Bennett's complaints that Jackson was abrasive, offensive, and inflexible were influenced by her investigation into him. Peivandi and Plamondon's complaints about Jackson's inflexible communication may also have been motivated by their unhappiness with Jackson's changes to the EEOP process. Similarly, some of the vendors who complained about Jackson could have been motivated by her insistence that they strictly comply with EEOP requirements. Although it is true that some of the employees who complained about Jackson's communication style were not directly involved in her protected activities, there is enough overlap between the employees who complained to Daly and the individuals objecting to Jackson's protected activities to call into question the strength of GCRC's nondiscriminatory proffered reason.

Finally, there is some reason to question Daly's credibility. Daly stated that Latimer was one of the employees who complained about Jackson's communication style, but Latimer himself stated that he had a great working relationship with Jackson and had never heard

complaints about her. Dickerson also stated that Daly told him that Jackson was "doing a great job" approximately two weeks before Daly fired her. (DE 15-35, Dickerson Dep., Page ID 592.)

When viewed in the light most favorable to Jackson, a reasonable juror could find that GCRC fired Jackson because of her protected activities rather than her communication style. While some evidence suggests that Jackson was abrasive and inflexible, there is other evidence that suggests she had a positive working relationship with many GCRC employees. Importantly, several of the individuals who complained about Jackson were also the subject of her protected activities, which potentially impacts their credibility. Given that Jackson's burden at this stage is relatively light, *George*, 966 F.3d at 462, the issue of causation should be decided by a jury.

* * *

In conclusion, the district court committed two errors. First, it incorrectly found that Jackson did not engage in protected activity because her investigations into complaints of discrimination and enforcement of EEOP policies were within her job responsibilities as human resource director. As previously explained, Jackson's investigations into Branch's complaints that Bennett was discriminating against him because of his race and Jackson's enforcement of EEOP policies were protected activities. Second, the district court erroneously found that Jackson had failed to demonstrate causation between her protected activities and termination. Because there remains a genuine factual dispute whether GCRC's proffered nondiscriminatory reason for Jackson's termination was pretextual, summary judgment on causation is improper.

B.

Jackson also appeals the district court's grant of summary judgment on her claim of wrongful termination against Michigan public policy. While Michigan courts generally allow an employer to fire an at-will employee for any reason or no reason at all, the reason for the termination cannot violate public policy. *Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004). An at-will employee's termination violates public policy if:

(1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) the employee is discharged for the failure or refusal to violate the law in

the course of employment; or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment.

*McNeil v. Charlevoix Cnty.*, 772 N.W.2d 18, 24 (Mich. 2009).

Jackson argues that she was discharged for failing or refusing to violate the law in the course of her employment because her termination was motivated by her enforcement of EEOP requirements. The district court granted GCRC's motion for summary judgment because it concluded that Jackson had failed to demonstrate a causal link between her enforcement of EEOP policies and her termination. For the reasons stated above, there remains a genuine factual dispute whether Jackson's employment was terminated for enforcing EEOP requirements and investigating claims of discrimination or because of her allegedly abrasive communication style. Thus, the district court incorrectly granted GCRC's motion for summary judgment on causation grounds.

IV.

We reverse the district court's grant of summary judgment.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-1334

MAKINI JACKSON,

     Plaintiff - Appellant,

     v.

GENESEE COUNTY ROAD COMMISSION,

     Defendant - Appellee.

> **FILED**
> May 27, 2021
> DEBORAH S. HUNT, Clerk

Before:  SILER, COLE, and GIBBONS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of summary judgment to Genesee County Road Commission is REVERSED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk